## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

WILLIAM J. SKEPNEK and
STEVEN M. SMOOT,

      **Plaintiffs,**

v.

ROPER & TWARDOWSKY, LLC and
ANGELA ROPER,

      **Defendants.**

Case No. 11-CV-4102-DDC-JPO

## MEMORANDUM AND ORDER

This matter comes before the Court on the following motions: (1) plaintiffs' Motion to Strike defendants' Expert Designations, Strike the Expert Report of Evan L. Goldman, and Preclude Testimony by Defendants' Witnesses at Trial (Doc. 271); (2) defendants' Motion for Summary Judgment (Doc. 267); and (3) plaintiffs' Motion for Summary Judgment (Doc. 270). For the following reasons, the Court grants plaintiffs' motion to strike, grants in part and denies in part defendants' motion for summary judgment, and grants plaintiffs' motion for summary judgment.

### I.  Motion to Strike

Plaintiffs filed their Motion to Strike on March 12, 2015. In it, they seek to (1) strike defendants' designations of Angela Roper, Kenneth S. Thyne, and Evan L. Goldman as experts; (2) strike Goldman's expert report; and (3) limit Roper's and Thyne's testimony to those subjects appropriate for fact witnesses. The Court concludes that the proposed testimony of all three experts is inadmissible under Federal Rule of Evidence 702, and therefore it grants plaintiffs' motion.

### A.  Legal Standard

The Court has a "gatekeeping obligation" to determine the admissibility of expert testimony.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).  In performing this gatekeeping role, the Court has broad discretion when deciding whether to admit expert testimony.  *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996).  Federal Rule of Evidence 702 permits a witness to testify as an expert only where the Court determines that "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  "The proponent of expert testimony bears the burden of showing that the testimony is admissible."  *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013) (citing *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009)).

Plaintiffs' primary argument against admitting Roper's, Thyne's, and Goldman's testimony is that it will not "assist the trier of fact" under Rule 702.  "Many factors have a bearing on whether expert testimony will assist the trier of fact."  29 Victor James Gold, Federal Practice and Procedure Evidence § 6264 (1st ed.).  One factor is whether expert testimony will undermine the judge's power to decide the law or encroach on the trier-of-fact's powers to judge the meaning of evidence and the credibility of witnesses.  *Id.*  "Indeed, it is ordinarily improper to have a witness testify regarding what the applicable law is; it is the trial judge's duty to inform the jury on the matter."  *United States v. Lake*, 472 F.3d 1247, 1263 (10th Cir. 2007).  Likewise, "testimony which articulates and applies the relevant law . . . circumvents the jury's decision-making function by telling it how to decide the case."  *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988).  Although Federal Rule of Evidence 704 permits experts to testify about ultimate issues of *fact*, they may not give opinions on ultimate issues of *law*.  *Id.* at 809.

### B.  Defendants' Experts

Defendants seek to present expert testimony from three witnesses:  Angela M. Roper, Kenneth S. Thyne, and Evan L. Goldman.  In their Fed. R. Civ. P. 26 disclosures, defendants stated that both Roper's and Thyne's experience as practicing attorneys in New Jersey qualifies them to testify as experts on topics that include:

> New Jersey Practice and procedure, New Jersey Rules of Professional Conduct, civil trial practice, fee-sharing agreements, contingency agreements, retainer agreements, and the damages sustained by [d]efendants as a result of [p]laintiffs' conduct in the underlying matter in addition to the present litigation.  Testimony will include the reasons why [p]laintiffs' claims are barred under New Jersey law, including but not limited to the [p]laintiffs' failure to have a contract, failure to have a fee-sharing agreement, failure to have retainer agreements, failure to perform work on the matter, failure to pay costs, failure to have joint responsibility for any clients, failure to comply with the *pro hac vice* rules, failure to comply with the New Jersey Rules of Professional Conduct, and the harm caused to [d]efendants by [p]laintiffs' numerous failures.

Doc. 277-1 at 3-4.  Roper is one of the defendants in this lawsuit.  Thyne is a lawyer with Roper & Twardowsky, LLC, the case's other defendant, and he represents defendants in this case.  Neither Roper nor Thyne have submitted an expert report.

Evan L. Goldman, defendants' third designated expert, is an attorney with over 30 years' experience practicing law in New Jersey.  Unlike Roper and Thyne, Goldman provided a report summarizing his likely testimony and conclusions.  Doc. 277-1 at 7-20.  The report lays out Goldman's view of the facts of this case, the controlling law, and whether plaintiffs can recover on each of their three claims.  He concludes that:  (1) plaintiffs are not entitled to an attorney's fee due to their failure to comply with the New Jersey Rules of Professional Conduct;

(2) plaintiffs do not have an enforceable fee-sharing agreement with defendants; and

(3) defendants breached no fiduciary duty to plaintiffs.  Doc. 277-1 at 7.

### C.  Discussion

Plaintiffs argue that the Court should strike defendants' expert designations because their proposed testimony would usurp the role of the judge and the jury in violation of Fed. R. Evid. 702.  In support, plaintiffs cite *Specht v. Jensen*, 853 F.2d 805 (10th Cir. 1988) (en banc), a "leading case" in this circuit.  *MCC Mgmt. of Naples, Inc. v. Int'l Bancshares Corp.*, 468 F. App'x 816, 821 (10th Cir. 2012).

In *Specht*, the Tenth Circuit considered "whether [Rule] 702 will permit an attorney, called as an expert witness, to state his views of the law which governs the verdict and opine whether [the] defendants' conduct violated that law."  853 F.2d at 806.  There, the plaintiffs had sued various government officials under 42 U.S.C. § 1983, alleging that they conducted illegal searches of the plaintiffs' home and office.  *Id.*  At trial, the plaintiffs called an attorney as an expert who "painstakingly developed over an entire day the conclusion that [the] defendants violated [the] plaintiffs' constitutional rights."  *Id.* at 808.  The attorney-expert "told the jury that warrantless searches are unlawful, that defendants committed a warrantless search on plaintiffs' property, and that the only applicable exception to the warrant requirement, search by consent, should not vindicate the defendants because no authorized person voluntarily consented to allow a search of the premises."  *Id.*  "He also stated that the acts of the private individual could be imputed to the accompanying police officer to constitute sufficient 'state action' for a § 1983 claim."  *Id.*

On appeal, the Tenth Circuit concluded that this testimony exceeded the scope of Rule 702 and thus was inadmissible.  The Court grounded its decisions on two principles.  First, the attorney-expert's testimony "encroached upon the trial court's authority to instruct the jury on the applicable law" by testifying that warrantless searches are unlawful and about exceptions to

the warrant requirement. *Id.* at 807-08. Such testimony tends to usurp the duty of the trial judge, "for it is axiomatic that the judge is the sole arbiter of the law and its applicability." *Id.* at 807. The Court noted that an attorney-expert is particularly problematic because "the jury may believe the attorney-[expert], who is presented to them imbued with all the mystique inherent in the title 'expert,' is more knowledgeable than the judge in a given area of the law." *Id.* at 809. Also, "[i]f one side is allowed the right to call an attorney to define and apply the law, one can reasonably expect the other side to do the same," so the "potential is great that jurors will be confused by these differing opinions, and that confusion may be compounded by different instructions given by the court." *Id.*

The second problem with the expert's testimony in *Specht* was that he testified about ultimate issues of law, concluding that the defendants had violated the plaintiffs' constitutional rights. *Id.* at 808. "[T]estimony which articulates and applies the relevant law . . . circumvents the jury's decision-making function by telling it how to decide the case." *Id.* "[A]n expert's testimony is proper under Rule 702 if the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding function." *Id.* at 809-10. "However, when the purpose of testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based, the testimony cannot be allowed." *Id.* at 810.

Plaintiffs argue that the proposed testimony of defendants' experts is like that testimony at issue in *Specht*, and therefore the Court must exclude it. The Court agrees. Roper and Thyne, each seek to testify about "the reasons why [p]laintiffs' claims are barred under New Jersey law, including but not limited to [p]laintiffs' failure to have a contract, failure to have a fee-sharing agreement, failure to have retainer agreements, . . . failure to comply with the *pro hac vice* rules, [and] failure to comply with the New Jersey Rules of Professional Conduct . . . ." Doc. 277-1 at

3-4.  Thus, these two witnesses seek to apply the facts to the law as they see it and testify

whether plaintiffs can recover on their claims.  This is one of the ultimate issues in this lawsuit.

Such testimony improperly "circumvents the jury's decision-making function by telling it how to

decide the case."  *Specht*, 853 F.2d at 808; *cf. United States v. Arutunoff*, 1 F.3d 1112, 1118 (10th

Cir. 1993) (holding expert testimony admissible because "he did not attempt to apply the law to

the facts of the case or otherwise tell the jury how the case should be decided.").

Roper's and Thyne's proposed testimony is particularly troublesome because they are

attorneys, a factor the Tenth Circuit considered critical in *Specht*.  853 F.2d at 808 ("There is a

significant difference between an attorney who states his belief of what law should govern the

case and any other expert witness.").  Because Roper and Thyne are attorneys seeking to tell the

jury how to decide this case, the Court concludes that they may not testify why plaintiffs' claims

are barred under New Jersey law.  And defendants' Rule 26 disclosures identify no other topic

on which they seek to testify.  At trial, Roper and Thyne may testify only as fact witnesses under

Fed. R. Evid. 701.

The putative expert testimony disclose by Goldman's expert report also is inadmissible.

In the report, Goldman, an attorney, explains in detail why he believes each of plaintiffs' three

claims fails.  The report is replete with legal citations and discussions of case law, and it reads

more like a brief than an expert opinion.  *See Romero v. Allstate Ins. Co.*, 52 F. Supp. 3d 715,

723 (E.D. Pa. 2014) (excluding report from law professor because it was "nothing more than a

legal opinion").  Much of Goldman's report is improper because it usurps the Court's authority

to instruct the jury about the law governing their deliberations.  *Specht*, 853 F.2d at 807.  For

instance, Goldman asserts:

- "To recover a contingency fee, an attorney must, at a minimum, comply with
  [New Jersey Rule of Professional Conduct] 1.5."  Doc. 277-1 at 16;

- "It is well-established that when attorneys fail to comply with New Jersey Rules regarding a fee contract, they cannot sue other attorneys who obtained the fees under a breach of contract theory." *Id.* at 18 (citing cases); and

- "New Jersey law requires that an attorney's fiduciary duty runs from the attorney to the client—there is and can be no conflicting fiduciary duty between co-counsel." *Id.* at 19.

These excerpts provide just a sampling of Goldman's attempts to define the law, which *Specht* held is improper. *Specht*, 853 F.2d at 810 ("In no instance can a witness be permitted to define the law of the case.").

Goldman's proposed expert testimony also is inadmissible because it supplants "the jury's ability to apply [the] law to the evidence." *Id.* at 808. Goldman comes to a definitive conclusion on each of plaintiffs' three claims, stating that: (1) plaintiffs cannot recover on their breach of contract claim because they did not "comply with the New Jersey Rules of Professional Conduct" and because they "do not have an enforceable fee-sharing agreement with [d]efendants"; (2) "[d]efendants breached no fiduciary duty to [p]laintiffs"; and (3) plaintiffs "are not entitled to any compensation" on their *quantum meruit* claim. Doc. 277-1 at 7-8. Such testimony tells the jury how to decide the case and therefore contradicts the rule established in *Specht*. 853 F.2d at 808; *accord Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997) (holding expert's testimony whether the defendant company's "officers and directors fulfilled their fiduciary duties to the Company, its creditors, and shareholders" was "a legal opinion and [thus] inadmissible").

Defendants argue that Goldman's report simply opines on the "custom and practice" of New Jersey lawyers and therefore does not attempt to define the law or improperly apply the law to the facts of the case. Doc. 281 at 1. This argument is fanciful, relying on a mischaracterization of the proposed testimony. As discussed above, Goldman seeks to testify

that plaintiffs cannot recover on their claims.  Indeed, defendants concede as much in their

memorandum in support of their motion for summary judgment, asserting:  "[d]efendants' expert

report provides a detailed analysis of [p]laintiffs' claims in this matter and how those claims for

breach of contract, fiduciary duty, and *quantum meruit* would be dismissed under New Jersey

law."  Doc. 268 at 32.  Because Goldman's report both attempts to define the law and dictate to

the jury how to decide the case, it is inadmissible under Rule 702.  *Specht*, 853 F.2d at 808

(holding that the trial court erred because it "allowed the expert to supplant both the court's duty

to set forth the law and the jury's ability to apply this law to the evidence.").

Finally, defendants argue that if the Court concludes that some part of Goldman's report

is inadmissible, "his testimony could be limited to exclude such testimony on the ultimate issue

at the time of trial."  Doc. 281 at 5.  But because his report contains opinions that would usurp

the function of both the judge and the jury, the Court need not deconstruct the expert disclosure

and try to pick out which parts, if any, are admissible.  The Court excludes Goldman, Roper, and

Thyne from testifying as experts on any of the subjects disclosed by their expert witness

designations and report.

## II. Defendants' Motion for Summary Judgment

### A.  Uncontroverted Facts

The Court next considers and rules on defendants' Motion for Summary Judgment.  The

following facts are uncontroverted or, where controverted, are stated in the light most favorable

to the party opposing summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Plaintiffs William J. Skepnek and Steven M. Smoot are attorneys licensed in Kansas and

Texas, respectively.  Defendant Roper & Twardowsky, LLC ("R&T") is a New Jersey limited

liability company located in Totowa, New Jersey.  Defendant Angela Roper is a licensed

attorney practicing and residing in New Jersey.  In this lawsuit, plaintiffs seek to recover a share of the attorney's fees defendants earned in another lawsuit.

In late summer or early fall of 2002, several people contacted defendants expressing concerns about an agreement they had entered to settle certain claims against Prudential Life Insurance Company of America.  These people believed that their lawyers in that case, a firm named Leeds, Morelli & Brown, had taken a $5 million payment from Prudential which they had concealed from their clients.  R&T eventually filed a lawsuit against Prudential and Leeds, Morelli & Brown on behalf of these clients (the "Prudential Clients").  To simplify the discussion of this backdrop, the Court refers to this lawsuit as the "Prudential Litigation" and to Prudential and Leeds, Morelli & Brown as the "Prudential Defendants."

Defendant Roper knew of plaintiff Skepnek and thought he might have expertise germane to some issues in the Prudential Litigation.  Roper contacted Skepnek to discuss this case, Skepnek expressed interest in becoming involved in it.  Around the fall of 2002, Skepnek and plaintiff Smoot visited the New Jersey offices of R&T to discuss the Prudential Litigation and the possibility of entering into a co-counsel agreement.  On December 2, 2002, Daria Twardowsky, an attorney with R&T, sent a letter to plaintiffs that said:

> Dear Steve and Bill:
>
> This shall confirm our understanding that the attorney's fees generated in the Prudential matters shall be split on a 50/50 basis between Roper & Twardowsky, LLC and Smoot/Skepnek.  It is also agreed that any and all costs (not advanced by the clients) shall be likewise split on a 50/50 basis.
>
> It is contemplated by this agreement that both of you shall be admitted pro hac vice in each of the Prudential matters, in which we are co-counsel.  It is anticipated that we shall equally participate in pre-trial discovery as well as in response to all motions.  Of course, if you are not admitted pro hac vice, this understanding will need to be modified.

9

> If you wish to enter into a more formal agreement regarding the allocation of fees and responsibilities, or wish to discuss changing this letter of understanding, please contact me.  If you think this letter is adequate, please affix your signatures and return to me.

Twardowsky signed the letter, and it included two signature blocks for Skepnek and Smoot to sign.

Defendants assert that the December 2002 letter was never executed and that Skepnek explicitly rejected it.  According to defendants, the parties decided to determine the precise fee arrangement in the Prudential Litigation at a later date.  Plaintiffs argue that the parties formed a contract to split fees, both orally and in writing, as evidenced by the December 2002 letter.  At his deposition, Skepnek testified that, "[t]he original agreement was an oral agreement which was memorialized by Daria Twardowsky.  Now, she didn't send me a letter saying I offer this.  It was not an offer.  It was a memorialization of a prior agreement."  Skepnek testified that he had joint responsibility for all of R&T's clients under the parties' initial oral agreement.  He also said that he signed the letter and believes he sent it to R&T.  Plaintiff Smoot does not recall whether he signed the letter.

According to Skepnek, the terms of the parties' oral contract were that "we were going to jointly prosecute the matter.  And when I say matter, I mean the Prudential case, on behalf of the initial group of clients, and thereafter as many others as we could—with good claims that we could obtain on a 50/50 fee sharing basis."  When asked whether there were any other terms to the agreement, Skepnek testified, "Oh, I think Daria's letter adequately sets forth what the agreement was."  Skepnek denied that the oral agreement called for him to "participate equally in pretrial discovery."  He denied that the agreement required him to "participate equally in response to all motions."  He also denied that the agreement required him "to be admitted in each of the Prudential matters that were filed *pro hac vice*" or that the parties even discussed *pro hac*

*vice* admission when making the oral agreement.  Skepnek believed that his role in the Prudential

Litigation would be as follows:

> I'm not admitted to practice in New Jersey, am not—am 1,300 miles distance
> from New Jersey.  Mr. Smoot's even farther away.  We were there because of our
> developed expertise in the area of suits concerning aggregate settlements.  And it
> was specifically discussed that I would be the person who would take the lead in
> taking the core depositions of the Prudential people and the Leeds, Morelli
> people, and that I would take the lead in the various hearings.  That Mr. Smoot
> and I would develop the theories and draft the important pleadings relating to the
> prosecution of our claims.

Whether or not the parties ever agreed to a fee arrangement, it is undisputed that they

agreed to bring a lawsuit against the Prudential Defendants.  In 2002, the parties signed retainer

agreements with seven people.  Of those seven, six decided to pursue the Prudential Litigation:

Thomas O'Donnell, Schubert Jacques, Arthur Talbot, Phillip Shapiro, Lawrence Lederman, and

Henry Bell.  In relevant part, these fee agreements provided:

> We are your attorneys.  "We" means our law firm.  You have consulted
> our law firm for legal advice and assistance concerning your potential claims
> against [the defendants in the Prudential litigation] . . . .

> Our firm's name and address are:

> ROPER & TWARDOWSKY, LLC
> Attorneys At Law
> Totowa, New Jersey 07512-2614
> Telephone: (973) 790-4441
> Facsimile: (973) 790-1016

> Due to the complexity and precedent-setting nature of your claims, we
> have become associated in this matter with the following attorneys:  William J.
> Skepnek, Esq. and Steven M. Smoot, Esq. whose addresses are respectively . . . .
> Insofar as your claims involve a complex field of law in which they are
> specialists, you have been advised that these attorneys shall make applications for
> admission to practice in this State for your case (*pro hac vice*).

On November 8, 2002, the parties filed a complaint on behalf of Prudential Client

Lawrence Lederman against the Prudential Defendants in the Superior Court of New Jersey.

Over the next several months, they filed additional lawsuits on behalf of Prudential Clients O'Donnell, Jacques, Talbot, Shapiro, and Bell.  Plaintiffs sought *pro hac vice* admission in New Jersey to assist in the Lederman case and the cases of two other Prudential Clients, O'Donnell and Jacques.  The New Jersey court granted their motions.  But plaintiffs never filed *pro hac vice* applications in any of the other cases filed by the Prudential Clients.  Plaintiffs assert that they did not need to obtain additional *pro hac vice* admissions because the New Jersey court eventually consolidated the cases filed by other Prudential Clients into Lederman's.

In March 2003, the Prudential Defendants filed a motion to compel arbitration and/or dismiss Lederman's lawsuit.  Plaintiffs drafted an 81-page brief that they eventually filed in response to the motion to dismiss.  Thyne, an attorney at R&T, asked Skepnek to present oral argument at the hearing on the motion, and, on September 8, 2004, he did so.  On October 8, 2004, the New Jersey trial court granted the Prudential Defendants' motion to compel arbitration and dismissed Lederman's case.  The trial court later stayed further proceedings in the Lederman case and the five other cases pending against the Prudential Defendants.  On November 11, 2004, the parties filed an appeal of the trial court's order dismissing Lederman's case.

Around this time, 11 more Prudential Clients signed fee agreements.  In relevant part, these agreements provided:

> We are your attorneys.  "We" means our law firms.  You have consulted our law firms for legal advice and assistance concerning your claims against Prudential Life Insurance Company of America, Inc., (hereinafter 'Prudential'), Leeds, Morelli & Brown, Lenard Leeds, Steven A. Morelli, Jeffrey K. Brown, and potentially others.

> Our firms' names and addresses are:

> ROPER & TWARDOWSKY, LLC          WILLIAM J. SKEPNEK
> Attorneys At Law                 900 Massachusetts, Suite 601
> Totowa, New Jersey 07512-2614    Lawrence, Kansas 66044
> Telephone: (973) 790-4441        Telephone: (785) 331-0300

Facsimile: (973) 790-1016          Facsimile: (785) 331-0303

      Two separate law firms are associated due to the complexity and precedent-setting nature of your claims.

While Lederman's appeal was pending before a New Jersey appellate court, the parties worked on drafting class action pleadings on behalf of hundreds of potential plaintiffs to bring claims like those already asserted in the Prudential Litigation. In March 2005, defendant Roper asked Skepnek to argue the appeal of the Lederman case. To that end, Roper filed an application to admit Skepnek *pro hac vice* in the Superior Court of New Jersey, Appellate Division. In January 2006, Roper sent an e-mail to Skepnek asking about his availability to argue Lederman's appeal in March, April, or May. The New Jersey appellate court eventually set oral argument in that appeal for April 5, 2006.

Sometime in 2005, and without plaintiffs' knowledge, defendants approached another law firm, Snyder, Slutkin & Snyder, to help with the Prudential Litigation. Defendants assert that they were forced to associate with another firm because plaintiffs were doing little to help them litigate the case. Plaintiffs dispute this assertion. On October 11, 2005, Roper sent an e-mail to the original six Prudential Clients informing them that she was finalizing a co-counsel relationship with Steven Snyder of Snyder, Slutkin & Snyder. She did not copy plaintiffs on this e-mail and did not inform plaintiffs that Snyder, Slutkin & Snyder had become involved in the Prudential Litigation until December 12, 2005. When defendants entered into the co-counsel agreement with the Snyder firm, they understood that they would have to compensate plaintiffs in the event they recovered fees in the Prudential Litigation, and the Snyder firm also agreed to negotiate this compensation jointly.

On March 22, 2006, Skepnek's office attempted to contact Roper about his plans to travel to New Jersey to argue the appeal in Lederman's case. Roper responded that Skepnek now did

not need to attend the oral argument.  On May 5, 2006, the New Jersey appeals court reversed the dismissal of Lederman's case and remanded it to the New Jersey trial court.  Roper forwarded the court's order to plaintiffs.  From May 2006 through June 2007, Skepnek made repeated attempts to initiate meetings with Prudential Clients and to conduct discovery in the Prudential Litigation, but Roper often rejected his suggestions.  On May 9, 2006, Smoot sent Roper an e-mail about the case and offered to meet with her.  Roper responded that the Prudential Defendants had filed a motion to stay the case but that she would update Smoot.  On that same day, Roper told Skepnek that the Prudential Defendants planned to seek review from the New Jersey Supreme Court of the earlier appellate court order in Lederman's case.  Skepnek urged Roper to continue to proceed with discovery and encouraged Thyne to file a motion to recuse the trial court judge.

On May 12, 2006, Roper asked Skepnek for his advice about a response to a motion to stay discovery.  On or about May 24, 2006, Skepnek talked to at least two of the original Prudential Clients, including Henry Bell.  Skepnek advised Roper that he had made plans to travel to New Jersey to have a group meeting with all of the clients on June 7-8, 2006.  Roper replied that she was unavailable on those dates.  During this time period, Roper told Bell that he did not need to communicate with Skepnek and that she had not spoken to Skepnek about how the Prudential Litigation would proceed.

On July 13, 2006, Snyder and Roper met with about 200 potential Prudential Clients without plaintiffs' knowledge.  On July 18, 2006, R&T entered into a Joint Prosecution Agreement with Snyder, Slutkin & Snyder.  By August 1, 2006, attendees of the July 13 meeting began coming to R&T's offices to sign fee agreements with R&T and Snyder.  Still, on August 4, 2006, Roper sent an e-mail to Skepnek that said "I am sure that Ken has told you nothing is

14

going on."  The record reveals only sporadic communication between the parties over the next several months.  On more than one occasion, plaintiffs sent e-mails to Roper, but she did not respond.

On June 13, 2007, Roper sent an e-mail to Skepnek informing him that Snyder wanted to dismiss Leeds, Morelli & Brown from the Prudential Litigation.  She asked whether Skepnek thought this was a good idea.  Skepnek ultimately concluded that dismissing Leeds, Morelli & Brown was not in the Prudential Clients' interest.  This sparked a disagreement between R&T and Snyder, and Snyder began to explore dissolving his relationship with R&T and representing the Prudential Clients by himself.  The division between Snyder and R&T grew heated.  On June 28, 2007, Snyder sent a letter to Roper which accused her of unethical behavior and challenged her mental competency.  On June 30, 2007, at the request of Roper, Skepnek responded to Snyder's letter by defending Roper and explaining why he believed the decision to dismiss Leeds, Morelli & Brown from the Prudential Litigation was misguided.  Also on June 30, Skepnek wrote a letter to the original six Prudential Clients advising them about the dispute between R&T and Snyder.

On July 2, 2007, Skepnek suggested that instead of engaging in motion practice with Snyder, the R&T and Snyder camps should hold a town hall meeting with clients to discuss their opposing views about how to proceed in the Prudential Litigation.  On July 12, 2007, Skepnek appeared at this meeting, which was attended by some 200 people.  Skepnek made the primary presentation for the R&T, Skepnek, and Smoot camp.  After the meeting, a number of clients called and spoke with Skepnek, at Roper's suggestion.  On July 18, 2007, Roper sent a letter to all of the clients who had attended the town hall meeting.  She thanked them for coming and specifically referenced Skepnek's presentation in the letter.  On July 19, 2007, Thyne urged all

clients at the town hall meeting to call Skepnek if they had any questions about the Prudential

Litigation.  Over the next several weeks, Thyne e-mailed Skepnek with a list of Prudential

Clients that had signed fee agreements with R&T.  Three of the original Prudential Clients—

Philip Shapiro, Lawrence Lederman, and Henry Bell—chose to sign instead with the Snyder

firm.  But 163 clients remained with R&T and signed retainer agreements with R&T and another

firm, Bendit Weinstock.  R&T had entered into a co-counsel arrangement with Bendit

Weinstock, agreeing to split the legal fees earned 60/40.  The retainer agreements did not

mention plaintiffs, although plaintiffs assert that Roper led them to believe that they were

included.

From August 2007 through 2010, Skepnek repeatedly requested updates from Roper and

sought to work on the Prudential Litigation, but Roper told Skepnek that the case could not

proceed with discovery because the New Jersey court would not allow it.  In truth, defendants

assert that they began a period of intense discovery and motion practice in 2007.  Defendants

argue that plaintiffs were not "meaningful" participants in the litigation during this time period.

Plaintiffs dispute this assertion.  For instance, Skepnek wrote legal memoranda on substantive

issues in the litigation several times during this period.  In a May 3, 2010 e-mail, Roper stated

that plaintiffs "are entitled to *quantum meruit*" for their time spent working on the Prudential

Litigation.  On the same day, Roper sent an e-mail that said:  "Ken [Thyne] pointed out to me

this evening that the agreement with Steve [Snyder] provides that he will pay 50% of any monies

due to Bill Skepnek."

In 2010, the cases in the Prudential Litigation were transferred for centralized case

management in the New Jersey mass tort court before Judge Brian Martinotti.  After months of

mediation, a potential settlement was reached on November 11, 2010.  This settlement resulted

in individual settlement offers to all clients of R&T and the Snyder firm.  The majority of these clients accepted the settlement offers.[1]  Plaintiffs did not know about and were not involved in this settlement or the mediation leading to it.  On November 24, 2010, Roper contacted plaintiffs to tell them that the Prudential Litigation may have settled.  Skepnek offered to help with the settlement, and between approximately December 8 and December 13, 2010, he communicated with defendants about how to structure it.  On April 14, 2011, Roper wrote to Skepnek:  "Bill.  If I believed that you were entitled to nothing, I would not have called you in the first place to notify you about the settlement.  If I had not called you, you would never have known about the Prudential settlement offers."  R&T asked plaintiffs to provide the hours that they worked so they could compensate plaintiffs.  To date, plaintiffs have not furnished their hours to R&T.

On March 11, 2011, plaintiffs submitted a Petition for Fees and Enforcement of Attorney's Charging Lien against R&T and the Snyder firm in New Jersey state court.  The court denied plaintiffs' lien against R&T on June 10, 2011, finding that "there was no retainer between any of the claimants setting forth the charging lien and the clients."  But the court continued:  "It should be noted that this has no bearing on whether or not any contractual claims that Mr. Skepnek—and the Skepnek Firm—may have against Roper . . . ."  Plaintiffs filed a motion for reconsideration, but the Court also denied it and dismissed their charging lien with prejudice.  On September 8, 2011, a few days before the New Jersey court ruled on plaintiffs' motion for reconsideration, plaintiffs filed this lawsuit.

### B.  Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When it applies this standard, the Court views the evidence and draws

---

[1] Forty-one Prudential Clients did not.  The cases that did not settle are still pending in New Jersey.

inferences in the light most favorable to the non-moving party. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co*., 619 F.3d 1243, 1245-46 (10th Cir. 2010)).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'" *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992), *cert. denied*, 506 U.S. 1013 (1992)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## C. Analysis

Plaintiffs' Complaint asserts three claims:  (1) breach of contract (Count I); (2) breach of fiduciary duty (Count II); and (3) *quantum meruit* (Count III).  Defendants seek summary judgment on all three claims.

### 1. Choice of Law

The Court first must determine which state's law applies to plaintiffs' claims.  "Absent a choice-of-law provision, a federal court sitting in diversity must apply the forum state's choice-of-law principles . . . ."  *Salt Lake Tribune Publ'g Co., LLC v. Mgmt. Planning, Inc.*, 390 F.3d 684, 695 (10th Cir. 2004).  Plaintiffs filed this case in the District of Kansas and the Court has exercised subject matter jurisdiction based on the parties' diversity of citizenship, so Kansas choice of law rules apply.

#### (a) Does the Choice of Law Matter in this Case?

"Under Kansas choice of law rules, the first inquiry is whether there is a true conflict among the state laws that could be applied to the claims."  *Thompson v. Jiffy Lube Int'l, Inc.*, 250 F.R.D. 607, 625 (D. Kan. 2008).  When there is no actual conflict, the Court need not analyze and apply the relevant choice of law rules.  *Id.*; *see Atchison, Topeka & Santa Fe Ry. Co. v. Stonewall Ins. Co.*, No. 94-cv-1464, 2000 WL 34001583, at *2 (Kan. Dist. Ct. July 24, 2000) ("Courts have recognized that there may be a 'false conflict'. . . .."); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816 (1985) ("We must first determine whether Kansas law conflicts in any

material way with any other law which could apply.  There can be no injury in applying Kansas law if it is not in conflict with that of any other jurisdiction connected to this suit.").

Plaintiffs assert that "[i]n most cases, the laws regarding [their] claims are similar in New Jersey and Kansas," Doc. 289 at 59, and during the pretrial conference in this case, "neither plaintiffs nor defendants could articulate any material differences in the laws of Kansas compared to New Jersey as applied to the facts of this case."  Doc. 256 at 2-3.  The Court notes that there are some differences between New Jersey Rule of Professional Conduct 1.5(e) and Kansas Rule of Professional Conduct 1.5(g), which govern fee-division agreements between lawyers in each state.  But the Court has analyzed both rules and concludes that these differences do not affect the outcome in this case.  Both parties rely on New Jersey law in their summary judgment briefs, and, for purposes of this motion, the Court will do the same.

### (b) Did Plaintiffs Waive Any Argument that Kansas Law Applies?

While neither party raises this question, the Court evaluates whether plaintiffs have waived any argument that Kansas law applies here.  Litigants can waive choice of law issues.  *Dr Pepper Co. v. Adams Inv. Co.*, No. 90-6078, 1991 WL 148876, at *1 (10th Cir. 1991) (unpublished opinion) ("Having waived the choice of law issue below, Adams cannot raise it on appeal."); *see also R.L. Clark Drilling Contractors, Inc. v. Schramm, Inc.*, 835 F.2d 1306, 1308 (10th Cir. 1987) (affirming district court's decision to prevent defendant from arguing a choice of law issue when it did not raise the issue in a timely fashion); *Neely v. Club Med Mgmt. Servs., Inc.*, 63 F.3d 166, 180 (3d Cir. 1995) ("[L]ike a plaintiff's need to prove one or more of the specific statutory elements of his or her claims, choice of law issues may be waived.").

In their motion for summary judgment, defendants spend two pages arguing that New Jersey law applies to this lawsuit. *See* Doc. 268 at 34-36. In response, plaintiffs state only the following:

> For purposes of this motion, [p]laintiffs will assume that New Jersey law applies to [p]laintiffs['] claims. Under Kansas choice of law rules, there are criteria in favor of applying Kansas law. *E.g.,* Restatement (First) of Conflict of Laws §332 (1934); *Wilkinson v. Shoney's, Inc.,* 269 Kan. 194, 210, 4 P.3d 1149 (2000) (place of last act of contract formation.). Nevertheless, with regard to [p]laintiffs' claims of breach of contract, breach of fiduciary duty, and *quantum meruit,* [p]laintiffs will primarily address New Jersey law. In most cases, the laws regarding these claims are similar in New Jersey and Kansas.

Doc. 289 at 58-59. Plaintiffs' response raises the question whether plaintiffs have consented to New Jersey law and therefore have waived any argument that Kansas law applies.

In *Dr Pepper Co. v. Adams Investment Co.,* the Tenth Circuit evaluated whether the defendant had waived a choice of law argument about which forum's law applied to the plaintiff's motion for attorney's fees. 1991 WL 148876, at *1. In its brief to the district court opposing the plaintiff's motion for attorney's fees, the defendant asserted:

> Arguments can be made that Texas law does not apply to the awarding of attorney fees to a prevailing party in this case, but since the only basis upon which Dr Pepper claims such right is Texas law, we will address ourselves to this point only and show that Texas law and Texas Statutes do not allow an award of attorney fees to Dr Pepper in this case even though it has been the prevailing party.

*Id.* The Tenth Circuit concluded that the defendant "made a deliberate choice to rely on Texas law, and cannot now say that the district court erred in holding [the defendant] to that choice." *Id.* "Having waived the choice of law issue below," the court ruled, the defendant "cannot raise it on appeal." *Id.*

The Court concludes that plaintiffs here also have made a deliberate choice to rely on New Jersey law and therefore have waived their argument that Kansas law applies, at least for purposes of this motion. Like the defendant in *Dr Pepper*, plaintiffs here mention in passing that

"there are criteria in favor of applying Kansas law." Doc. 289 at 58. But they then elect to rely on New Jersey law, stating: "For purposes of this motion, [p]laintiffs will assume that New Jersey law applies to [p]laintiffs' claims." *Id.* In the Court's view, plaintiffs have chosen to rely on New Jersey law, and the Court will hold them to that choice. *See Huber v. Taylor*, 469 F.3d 67, 84 (3d Cir. 2006) ("In my view, plaintiffs' references to Texas law did not satisfy our usual requirement that all issues be clearly articulated in a party's briefs to avoid waiver."). Plaintiffs have waived any argument that Kansas law governs their claims, at least for purposes of this motion.

### 2. Are Defendants Entitled to Summary Judgment on Plaintiffs' Breach of Contract Claim?

#### (a) Did the Parties Have a Contract about Fees which Defendants' Breached?

Plaintiffs assert that the parties formed a contract to split fees earned in the Prudential Litigation evenly and that defendants breached this contract by refusing to pay plaintiffs their share of the fees. Defendants argue that they are entitled to summary judgment on this claim because plaintiffs cannot establish the elements of a breach of contract claim. To recover for breach of contract under New Jersey law, plaintiffs must prove: "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party asserting the claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007) (applying New Jersey law).

First, defendants argue that the parties never entered into a contract to share fees. To establish a valid contract, a party must prove: (1) a meeting of the minds; (2) an offer and acceptance; (3) consideration; (4) reasonably certain contract terms. *Big M, Inc. v. Dryden Advisory Grp.*, No. 08-3567 (KSH), 2009 WL 1905106, at *13 (D. N.J. June 30, 2009) (citing

N.J. Jury Instr. Civ. 4.10C).  Plaintiffs contend that they formed both an oral and a written

contract to divide fees in the Prudential Litigation.  In 2002, the parties met in New Jersey to

discuss acting as co-counsel in the Prudential Litigation.  At some point, according to plaintiffs,

they agreed orally to prosecute the Prudential Litigation jointly and to split fees evenly.  On

December 2, 2002, Daria Twardowsky of R&T sent a letter to plaintiffs which said:

> Dear [plaintiffs] Steve and Bill:
>
> This shall confirm our understanding that the attorney's fees generated in the Prudential matters shall be split on a 50/50 basis between Roper & Twardowsky, LLC and Smoot/Skepnek.  It is also agreed that any and all costs (not advanced by the clients) shall be likewise split on a 50/50 basis.
>
> It is contemplated by this agreement that both of you shall be admitted pro hac vice in each of the Prudential matters, in which we are co-counsel.  It is anticipated that we shall equally participate in pre-trial discovery as well as in response to all motions.  Of course, if you are not admitted pro hac vice, this understanding will need to be modified.
>
> If you wish to enter into a more formal agreement regarding the allocation of fees and responsibilities, or wish to discuss changing this letter of understanding, please contact me.  If you think this letter is adequate, please affix your signatures and return to me.

Doc. 269-1 at 2-3.  Twardowsky signed this letter, and it included two signature blocks for

plaintiffs Skepnek and Smoot to sign.  Skepnek asserts that he signed this letter and mailed it

back to R&T.

The Court concludes that a genuine issue of material fact exists about whether the parties

entered into a contract to split fees.  Defendants argue only that the December 2, 2002 letter is

not a contract.  In doing so, they ignore plaintiffs' allegation that the parties had formed an *oral*

agreement to split fees.  In the Pretrial Order in this case, plaintiffs assert that "[o]rally and in a

written fee division agreement, Roper & Twardowsky and plaintiffs agreed to jointly handle the

litigation against the law firm and Prudential and to divide legal fees with 50 percent to Roper &

Twardowsky and 50 percent to plaintiffs." Doc. 256 at 4. The next sentence continues this theme, asserting plaintiffs' theory that the parties agreed to perform various duties "[u]nder the terms of the parties' *oral agreement*." *Id.* (emphasis added). Also, the December 2, 2002 letter explicitly states that it "*shall confirm our understanding* that the attorney's fees generated in the Prudential matters shall be split on a 50/50 basis between" R&T and plaintiffs, indicating that the parties previously agreed to split fees. Doc. 269-1 at 2. It is settled law that in many cases, oral contracts are enforceable. *Radiological Soc'y of N.J. v. Sheeran*, 418 A.2d 1300, 1305-06 (N.J. Super. Ct. App. Div. 1980) ("Unless a requirement exists, a contract need not be expressed in writing so long as the parties have mutually agreed to do something which they previously did not have an obligation to do."). And defendants present no argument that the oral agreement asserted by plaintiffs is unenforceable. Defendants essentially ignore plaintiffs' oral contract claim, and, as a result, they have failed to show that no genuine issue of material fact exists whether the parties orally agreed to share fees in the Prudential Litigation.

The Court also rejects defendants' argument that the parties lacked a contract for a second reason: A genuine issue of material fact exists about whether the December 2, 2002 letter amounts to a contract. An alleged contract "must be sufficiently definite that the performance to be rendered by each party can be ascertained with reasonable certainty." *Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 284 (N.J. 1992) (quotation omitted). "[I]f parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract." *Id.* This December 2 letter states that it "shall confirm [the parties'] understanding" to split fees and costs in the Prudential litigation evenly. Doc. 269-1 at 2. Thus, the letter is evidence that the parties agreed on essential price terms and manifested an intent to be bound by those terms. Defendants excerpt several passages from Skepnek's deposition in

24

which, they argue, he "denied every single term and condition contained within the letter." Doc. 268 at 44. But defendants never identify any testimony where Skepnek denied that the parties agreed to split fees evenly and share costs. Thus, there is a genuine issue of material fact whether the December 2 letter constitutes a contract between the parties.

Next, defendants argue that plaintiffs cannot recover for breach of contract because they failed to perform their own contractual obligations. The Court rejects this argument for several reasons. At the outset, a genuine factual dispute exists about the terms of the contract which the parties entered. As a result, the Court cannot decide at the summary judgment stage whether plaintiffs breached their contractual obligations because admissible evidence establishes a dispute about what those obligations are. Next, the record belies defendants' assertion that plaintiffs did not contribute to the Prudential Litigation. Indeed, the summary judgment record contains several pieces of admissible evidence that, if accredited by a jury, would show that plaintiffs worked on the Prudential Litigation or aided defendants in pursuing it. For instance, it is undisputed that plaintiffs drafted an 81-page brief opposing the Prudential Defendants' motion to dismiss in New Jersey state court. Thus, the Court rejects defendants' claim that plaintiffs performed no work to support the Prudential Litigation.

Finally, plaintiffs argue that any failure to perform the contractual duties was caused primarily by defendants' actions. "When, under a valid contract to perform a specified work for a specified price, the plaintiff has done part, and has been prevented from performing completely through the fault of the defendant, the legal measure of the plaintiff's damages is, generally, for the work done, such a proportion of the entire price as the fair cost of that work bears to the fair cost of the whole work, *and, in respect to the work not done, such profits as he would have realized by doing it.*" *Kehoe v. Borough of Rutherford*, 27 A. 912, 912 (N.J. 1893) (emphasis

added).  In the words of a leading treatise, "[w]hen performance of a condition precedent to a promisor's liability has been prevented by the promisor, an action for damages may be maintained by the promisee without rendering its own performance."  13 Williston on Contracts § 39:12 (4th ed.).  Plaintiffs cite many e-mails where Skepnek tried to participate in the litigation, but defendants either rejected or ignored his help.  Thus, there is a genuine issue of material fact whether defendants' prevented plaintiffs from performing.  For these reasons, the Court denies defendants' motion for summary judgment to the extent they argue that plaintiffs did not perform their contractual obligations.

Defendants next argue that they did not breach any contract with plaintiffs.  Plaintiffs assert that defendants owe them 50% of the attorney's fees defendants earned in the Prudential Litigation.  It is undisputed that defendants earned fees in the Prudential Litigation and that they have not paid 50% of those fees to plaintiffs.  Thus, there is a genuine issue of material fact whether plaintiffs have breached a contract.

Finally, defendants argue that the doctrines of res judicata and collateral estoppel bar plaintiffs' claims.  On March 11, 2011, plaintiffs filed a petition in the New Jersey Superior Court seeking a lien on the attorney's fees that defendant Roper received in the settlement of the Prudential Litigation.  On June 10, 2011, the New Jersey court denied plaintiffs' petition, concluding that "the charging lien statute cannot be used by Skepnek to establish a charging lien on Roper's fees."  Doc. 269-4 at 17.  But the New Jersey court continued that "[i]t should be noted that this has no bearing on whether or not any contractual claim that Mr. Skepnek . . . may have against Roper . . . ."  *Id.*  Thus, the New Jersey court expressly stated that its decision had no bearing on plaintiffs' contract claims.  The Court rejects defendants' argument that res judicata and collateral estoppel bar plaintiffs' breach of contract claim.  The Court therefore

denies defendants' motion for summary judgment to the extent it argues that plaintiffs cannot

prove the elements of a breach of contract claim.

### (b) Does RPC 1.5(e) Bar Plaintiffs' Breach of Contract Claim?

Defendants also argue that they are entitled to summary judgment because New Jersey

Rule of Professional Conduct ("RPC") 1.5(e) bars plaintiffs' claim.  RPC 1.5(e) provides:

> Except as otherwise provided by the Court Rules, a division of fee between lawyers who are not in the same firm may be made only if:
>
> > (1) the division is in proportion to the services performed by each lawyer, or, by written agreement with the client, each lawyer assumes joint responsibility for the representation; and
> >
> > (2) the client is notified of the fee division; and
> >
> > (3) the client consents to the participation of all the lawyers involved; and
> >
> > (4) the total fee is reasonable.

N.J. Rules Prof'l Conduct R. 1.5(e).  New Jersey courts refuse to enforce fee-division

agreements between lawyers that fail to comply with RPC 1.5(e).  *Goldberger, Seligsohn &*

*Shinrod, P.A. v. Baumgarten*, 875 A.2d 958, 963 (N.J. Super. Ct. App. Div. 2005) ("Relief could

not be awarded for a breach of the alleged agreement because it was contrary to [RPC 1.5(e)].");

*see also Vinick v. Friedman*, No. A-2590-09T3, 2011 WL 3176712, at *4 (N.J. Super. Ct. App.

Div. July 28, 2011) ("A failure to comply with RPC 1.5(e) forecloses the ability of an attorney to

recover against another attorney under a breach of contract theory because '[the alleged

agreement] was contrary to law.'") (quoting *Goldberger*, 875 A.2d at 963).[2]

---

[2] The New Jersey Supreme Court has not decided whether *Goldberger* was decided correctly.  When there is no case law from the highest state appellate court directly on point, courts "must in essence sit as a state court and predict how the highest state court would rule."  *Wood v. Eli Lilly & Co.*, 38 F.3d 510, 512 (10th Cir. 1994).  The New Jersey Superior Court, Appellate Division decided *Goldberger* in 2005, and nothing suggests that the New Jersey Supreme Court would overrule it.  As a result, the Court concludes that any fee-sharing agreement between the parties is unenforceable unless it complies with RPC 1.5(e).

Plaintiffs allege that "[o]rally and in a written fee division agreement, [R&T] and plaintiffs agreed to jointly handle the litigation against the law firm and Prudential and to divide legal fees" evenly. Doc. 256 at 4. The Court already has concluded that a genuine issue of material fact exists about whether the parties agreed to split fees. But even if the parties did enter a fee-sharing agreement, it is unenforceable under RPC 1.5(e).

The 2002 agreement between the parties, whether oral or written, does not satisfy RPC 1.5(e). RPC 1.5(e)(1) provides that lawyers from different firms can enter into a fee-division agreement only if the agreement "is in proportion to the services performed by each lawyer, or, by written agreement with the client, each lawyer assumes joint responsibility for the representation." RPC 1.5(e)(1). Here, plaintiffs never assert that they performed 50% of the work in the Prudential Litigation. Neither the oral agreement to split fees nor the memorialization of the agreement informed any client, in writing, that plaintiffs and defendant R&T were assuming "joint responsibility" for the representation. Indeed, no Prudential Client was even a party to the alleged fee-sharing agreement between plaintiffs and R&T. As a result, plaintiffs cannot base their breach of contract claim solely on the 2002 agreement.

Plaintiffs do not concede defeat, however. R&T signed fee agreements with around 160 clients in the Prudential Litigation. Plaintiffs argue that these fee agreements satisfy RPC 1.5(e) and therefore support a breach of contract claim. The Court divides the relevant fee agreements into three categories for purposes of the analysis required here: (1) six agreements signed in 2002; (2) 11 agreements signed in and around 2004; and (3) approximately 161 fee agreements signed in 2007.

The Court starts with the last category—approximately 161 fee agreements signed by Prudential Clients in 2007. RPC 1.5(e) requires that each lawyer must, "by written agreement

with the client, . . . assume joint responsibility for the representation." RPC 1.5(e)(1). But it is undisputed that the 2007 agreements do not even mention plaintiffs, let alone establish that they assumed "joint responsibility" for the representation. Plaintiffs argue that defendants deceived them by representing that plaintiffs were referenced as co-counsel in the agreements. Even if this is true, it does not save plaintiffs' breach of contract claim. New Jersey courts are clear that "[r]elief could not be awarded for a breach of the alleged agreement" when it failed to comply with RPC 1.5(e). *Goldberger*, 875 A.2d at 963. Plaintiffs do not have any written agreement with the clients who signed the 2007 fee agreements. As a result, RPC 1.5(e) bars plaintiffs' breach of contract claim for fees defendants earned under the agreements signed by Prudential Clients in 2007.

The other two batches of fee agreements, unlike the 2007 agreements, at least mention plaintiffs. In 2002, the original six Prudential Clients signed fee agreements. Of those six, only three—Thomas O'Donnell, Schubert Jacques, and Arthur Talbot—are clients who produced fee income (the other three switched to the Snyder firm as the case progressed). The section entitled "The Attorney" in the 2002 fee agreements provides:

> We are your attorneys. "We" means our law firm. You have consulted our law firm for legal advice and assistance concerning your potential claims against [the defendants in the Prudential litigation] . . . .
>
> Our firm's name and address are:
>
> ROPER & TWARDOWSKY, LLC
> Attorneys At Law
> Totowa, New Jersey 07512-2614
> Telephone: (973) 790-4441
> Facsimile: (973) 790-1016
>
> Due to the complexity and precedent-setting nature of your claims, we have become associated in this matter with the following attorneys: William J. Skepnek, Esq. and Steven M. Smoot, Esq. whose addresses are respectively . . . . Insofar as your claims involve a complex field of law in which they are

specialists, you have been advised that these attorneys shall make applications for admission to practice in this State for your case (*pro hac vice*).

Doc. 289-6 at 3.  Defendants contend that these original six fee agreements fail to satisfy the requirements of RPC 1.5(e) because plaintiffs never assumed "joint responsibility" for the representation in them.

New Jersey courts have not defined or analyzed the term "joint responsibility" as it is used in RPC 1.5(e).  But RPC 1.5(e) is similar to ABA Model Rule Professional Conduct 1.5(e), and New Jersey courts often look to the ABA Model Rules for guidance.  *See Matter of Op. 668 of Advisory Comm. on Prof'l Ethics*, 633 A.2d 959, 961 (N.J. 1993) (analyzing Comment to ABA Model Rule 4.2); *Goff v. Wheaton Indus.*, 145 F.R.D. 351, 353 (D.N.J. 1992) ("Without a clear statement as to the breadth of RPC 4.2, this analysis will begin, as courts before me have, with an examination of the ABA's Official Comments to the Rule.").

Comment 7 to the ABA Rule 1.5 provides:  "Joint responsibility for the representation entails financial and ethical responsibility for the representation as if the lawyers were associated in a partnership."  ABA Model Rule of Professional Conduct 1.5, cmt. 7.  Nothing in the 2002 fee agreements suggest that plaintiffs have "financial and ethical responsibility" for the original six Prudential Clients.  On the contrary, the fee agreement states, "We are your attorneys.  'We' means our law firm. . . .  Our firm's name and address are:  ROPER & TWARDOWSKY . . . ."  Doc. 289-6 at 3.  Thus, the fee agreement uses "law firm" in its singular form and identifies R&T as the clients' "attorneys."  The fee agreement also provides that "we [*i.e.*, R&T] have become associated in this matter with" plaintiffs.  *Id.* at 3.  But though this provision discloses that plaintiffs will have some role in these clients' cases, it never suggests that they share joint responsibility—*i.e.*, financial and ethical responsibility—with R&T.  The 2002 fee agreements

30

do not satisfy the first prong of RPC 1.5(e) and thus cannot support plaintiffs' breach of contract claim as a matter of law.

This leaves the fee agreements that 11 Prudential Clients signed in and around 2004. These agreements are similar to the 2002 agreements, but the 2004 agreements differ by including plaintiff Skepnek in the section entitled "The Attorney":

> We are your attorneys.  'We' means our law firms. . . .
>
> Our firms' names and addresses are:

| ROPER & TWARDOWSKY, LLC | WILLIAM J. SKEPNEK |
|---|---|
| Attorneys At Law | 900 Massachusetts, Suite 601 |
| Totowa, New Jersey 07512-2614 | Lawrence, Kansas 66044 |
| Telephone: (973) 790-4441 | Telephone: (785) 331-0300 |
| Facsimile: (973) 790-1016 | Facsimile: (785) 331-0303 |

> Two separate law firms are associated due to the complexity and precedent-setting nature of your claims.

Doc. 289-19 at 3.

Thus, the 2004 agreements use the plural "law firms" and list R&T's and Skepnek's names and addresses together on the same block.  Nevertheless, defendants argue that plaintiffs never assumed "joint responsibility" for the representation in these agreements.  The Court agrees as this argument applies to plaintiff Smoot.  The 2004 agreements do not even mention him, and therefore he cannot recover on a breach of contract claim under RPC 1.5(e).  But the Court concludes that Skepnek assumed joint responsibility for the representation in the 2004 agreements.  The agreements define both R&T and Skepnek as the clients' "attorneys" and "law firms."  Thus, unlike the 2002 fee agreements, these 2004 agreements suggest that R&T and plaintiff Skepnek are equal co-counsel and therefore jointly responsible for representing the clients.  The Court thus concludes that the 2004 agreements satisfy the requirements of RPC 1.5(e)(1) for Skepnek.

But defendants also argue that plaintiffs cannot recover on the 2004 fee agreements because the clients were never "notified of the fee division," as RPC 1.5(e)(2) requires. Plaintiffs assert that the "language" of these agreements satisfies the notification requirement. Doc. 289 at 65.  Plaintiffs do not contend that the 11 clients who signed the 2004 agreements were "notified of the fee division" from any other source.  RPC 1.5(e)(2).  As a result, the Court looks only to the text of the 2004 agreements to determine whether they satisfy RPC 1.5(e)(2).

The Court has found no case, from New Jersey or elsewhere, that discusses when a client "is notified of the fee division" for purposes of RPC 1.5(e)(2).  The Court again looks to the ABA Model Rule of Professional Conduct 1.5 for guidance about how to interpret its New Jersey counterpart.  Before 2002, the ABA's Rule 1.5 and RPC 1.5 were virtually identical.  Neither rule required the lawyers to disclose any information about their agreement to divide fees. Indeed, Comment 4 to the pre-2002 ABA Rule 1.5 provided that the rule "does not require disclosure to the client of the share that each lawyer is to receive."  In 2002, the ABA adopted substantial revisions to the model rules, including Rule 1.5.  The revised, current rule mandates that the client must "agree" to the fee division agreement, "including the share each lawyer will receive . . . ."  ABA Model Rule of Professional Conduct 1.5(e)(2).

In 2001, the New Jersey Supreme Court appointed a Commission to evaluate the proposed changes to the Model Rules and recommend revisions.  The Commission recommended adding the notification requirement.  In its report to the New Jersey Supreme Court, the Commission stated:

> The Commission recommends the retention of RPC 1.5, but adds the requirement that lawyers must notify a client of a division of fees between lawyers who are not in the same firm.  The Commission does not support the ABA Commission's proposal to require a client's consent to the division of a fee between lawyers who are not in the same firm.

Supreme Court of New Jersey, Administrative Determinations in response to the Report and Recommendation of the Supreme Court Commission on the Rules of Professional Conduct, at 13-14 (September 10, 2003), *available at* http://www.judiciary.state.nj.us/notices/reports/admin-deter-rpcs.pdf.

Thus, RPC 1.5(e) does not require a client to "agree" to the precise fee division formula, but the client at least must be "notified" of it. While the New Jersey rules do not define the term "notified," the Court concludes that the 2004 agreements failed to do so under any normal construction of the word. "N.J.S.A. 1:1–1 provides that words and phrases shall be given their generally accepted meaning, unless that meaning is inconsistent with the clear intent of the Legislature or unless the statute provides a different meaning." *Shelton v. Restaurant.com, Inc.*, 70 A.3d 544, 557 (N.J. 2013). The definition of "notify" in the Merriam-Webster dictionary is "to tell (someone) officially about something." Merriam-Webster Dictionary, *available at* http://www.merriam-webster.com/dictionary/notify. Nothing in the 2004 agreements "tell" the clients "officially about" the fee division. The agreements have a section called "Legal Fees and Costs" which outlines the fees and costs for which each client will be responsible, including contingent fees. But it never mentions any division of fees between R&T and Skepnek. And although the agreements arguably *imply* that the lawyers will split any fees recovered, nothing in them clearly states that the parties have an agreement to split fees. The Court therefore concludes that the 2004 fee agreements do not notify the clients about a fee division agreement between the parties, so they cannot serve as a basis to recover attorney's fees. Because plaintiffs have identified no fee division agreement that complies with RPC 1.5(e), plaintiffs cannot recover attorney's fees on a breach of contract theory. *Goldberger*, 875 A.2d at 963. As a result, the Court grants summary judgment for defendants on plaintiffs' breach of contract claim.

### 3. Are Defendants Entitled to Summary Judgment on Plaintiffs' *Quantum Meruit* Claim?

Plaintiffs argue that even if the Court grants summary judgment on their breach of contract claim, they can still recover under a *quantum meruit* theory. "*Quantum meruit* is a form of quasi-contractual recovery and 'rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another.'" *Goldberger*, 875 A.2d at 964 (quoting *Weichert*, 608 A.2d at 285). "Courts generally allow recovery in *quasi*-contract when one party has conferred a benefit on another, and the circumstances are such that to deny recovery would be unjust." *Weichert*, 608 A.2d at 285. To recover under a theory of *quantum meruit,* a plaintiff must establish: (1) the performance of services in good faith; (2) the acceptance of the services by the person to whom they are rendered; (3) an expectation of compensation therefor; and (4) the reasonable value of the services. *Starkey, Kelly, Blaney & White v. Estate of Nicolaysen*, 796 A.2d 238, 242-23 (N.J. 2002).

Defendants make a host of largely unsupported arguments in their motion for summary judgment against this claim. First, they argue that plaintiffs can assert *quantum meruit* claims only against those clients with whom plaintiffs had retainer agreements. According to defendants, this means that plaintiffs can recover only fees earned from the original six Prudential Clients. But *quantum meruit* is an equitable, quasi-contractual remedy which applies specifically in situations *where no contract exists*. The second element for *quantum meruit* in New Jersey requires a plaintiff to show "the acceptance of the services by the person to whom they are rendered." *Id.* at 243. Nothing in the text of this element suggests that plaintiffs must have a contract with the person to whom they provided services, and defendants cite no authority indicating otherwise. The Court rejects defendants' first argument.

Second, defendants argue that plaintiffs have failed to present sufficient evidence of the "reasonable value of their services," the fourth element of a *quantum meruit* claim. Essentially, defendants assert that the Court must grant summary judgment unless plaintiffs present evidence of the hours they spent representing each Prudential Client. But the cases defendants cite do not support their position. In *Buckelew v. Grossbard*, the Superior Court of New Jersey, Law Division, noted that "time is not the only factor to be used in ascertaining a reasonable fee . . . ." 461 A.2d 590, 592 (N.J. Super. Ct. Law Div. 1983), *aff'd* 469 A.2d 518 (N.J. Super. Ct. App. Div. 1983). And in *La Mantia v. Durst*, the Superior Court of New Jersey, Appellate Division, concluded that both the length of time spent representing a client *and* the quality of that representation were relevant to determining a fee award base on a *quantum meruit* theory. 561 A.2d 275, 278 (N.J. Super. Ct. App. Div. 1989) (emphasis added).

The record contains substantial evidence that plaintiffs performed services for the Prudential Clients, which defendants accepted, and that plaintiffs reasonably expected compensation for these services. And, although not dispositive, defendant Roper concedes as much. In a May 3, 2010 e-mail to another lawyer, Roper wrote: "[Plaintiffs] are entitled to *quantum meruit*." Doc. 289-142 at 2. While the burden is on plaintiffs to prove the "reasonable value of their services" at trial, the Court concludes that they have presented enough evidence at this stage to conclude that they are entitled to submit this question to the factfinder. *Estate of Nicolaysen*, 796 A.2d at 242-23. The Court rejects defendants' second argument.

Third, defendants argue that the New Jersey court already has considered and rejected plaintiffs' *quantum meruit* claim when it denied the charging lien for attorney's fees. However, as mentioned above, the New Jersey judge explicitly stated that his decision to deny plaintiffs' charging lien "has no bearing on whether or not any contractual claims that Mr. Skepnek—and

the Skepnek Firm—may have against Roper . . . ." Doc. 269-4 at 17.  While *quantum meruit* is a quasi-contract theory, the Court cannot find any reason to believe that the New Jersey court meant his lien ruling to exclude a *quantum meruit* theory.  The Court thus rejects defendants' argument that the order dismissing plaintiffs' charging lien affects their *quantum meruit* claim.

Fourth, defendants argue that plaintiffs' claim fails because the Prudential Clients are the proper parties to a *quantum meruit* claim, not defendants.  Defendants cite no law to support this assertion.  And *Goldberger*, which the Court discussed above and defendants cite in their briefs, refutes their argument.  In *Goldberger*, the plaintiff, an attorney, sued a lawyer in a different firm for breach of an alleged fee-splitting contract and *quantum meruit*.  875 A.2d at 960.  The plaintiff did not name any client as a defendant.  *See id.*  The trial court granted summary judgment on both claims, but the Superior Court of New Jersey, Appellate Division, reinstated the *quantum meruit* claim, concluding that the plaintiff had presented sufficient evidence to survive summary judgment.  *Id.* at 964.  *Goldberger* therefore permitted a *quantum meruit* claim to proceed in a suit between lawyers where the client was not a party.  The Court rejects defendants' argument that plaintiffs must name the Prudential Clients to pursue their *quantum meruit* claim.

Finally, defendants argue that "[w]hen more than one attorney represents a client on a contingency fee basis, a claim for *quantum meruit* recovery requires that all attorneys sharing in the contingency fee be joined."  Doc. 268 at 57.  The Court can think of no reason why plaintiffs must join parties from whom they do not seek recovery.  And defendants identify no cases that support their argument.  The Court therefore rejects it, and as a result, the Court denies defendants' motion for summary judgment on plaintiffs' *quantum meruit* claim.

**4.  Are Defendants Entitled to Summary Judgment on Plaintiffs' Breach of Fiduciary Duty Claim?**

Finally, defendants seek summary judgment against plaintiffs' breach of fiduciary duty claim.  In their Complaint, plaintiffs allege that "the joint representation and the Fee Division Agreement created a fiduciary relationship" between the parties.  Doc. 1 at ¶ 59.  Plaintiffs continue that defendants breached their fiduciary duties by, among other things, refusing to pay plaintiffs 50% of the attorney's fees defendants earned, omitting plaintiffs from the 2007 fee agreements with Prudential Clients, and preventing plaintiffs from pursuing the Prudential Litigation.  *Id.* at ¶ 60.

In their opposition to defendants' motion, plaintiffs assert that the parties entered into a "joint venture" when they allegedly agreed in 2002 to pursue the Prudential Litigation.  Plaintiffs assert that members of a joint venture, unlike parties to an ordinary contract, owe fiduciary duties to each other.  *See Lo Bosco v. Kure Eng'g Ltd.*, 891 F. Supp. 1020, 1033 (D. N.J. 1995) ("There can be no question that joint venturers owe each other a fiduciary duty.")  Defendants respond that the Court should reject this argument for two reasons:  (1) plaintiffs cannot assert that the parties formed a joint venture because they raised such a theory for the first time at a very late stage in this lawsuit—well after discovery had closed and just before the pretrial conference; and (2) even if the Court permits them to assert such a theory, New Jersey law does not recognize a breach of fiduciary duty claim between attorneys to recover a lost fee.

The Court concludes that even if the parties had formed a joint venture, defendants are entitled to summary judgment because New Jersey law does not recognize a breach of fiduciary duty between co-counsel to recover a lost fee.  The Court acknowledges that it has found no New Jersey case on point.  But in such situations, a federal court exercising diversity jurisdiction "must in essence sit as a state court and predict how the highest state court would rule."  *Wood,*

38 F.3d at 512.  The Court predicts that the Supreme Court of New Jersey would hold, as a matter of public policy, that no fiduciary duties exist between co-counsel for lost prospective fees.

The Court begins its analysis by looking at how other jurisdictions have addressed this issue.  The highest courts in at least three states have established "bright-line" rules prohibiting claims that co-counsel have a fiduciary duty to protect one another's prospective interests in a fee.  *See Beck v. Wecht*, 48 P.3d 417, 423 (Cal. 2002) ("Should this issue—whether cocounsel owe one another a fiduciary duty to conduct their joint representation in a manner that does not diminish or eliminate the fees each expects to collect—be decided on a case-by-case basis?  We think not.  The better approach, we conclude, is a bright-line rule refusing to recognize such a fiduciary duty."); *Mazon v. Krafchick*, 144 P.3d 1168, 1171 (Wash. 2006) (holding that "it would violate public policy to allow attorneys to sue each other on the theory that cocounsel have a fiduciary duty to protect one another's prospective interests in a contingency fee" (quotation omitted)); *Scheffler v. Adams & Reese, LLP*, 950 So. 2d 641, 653 (La. 2007) ("Accordingly, we hold that, as a matter of public policy, based on our authority to regulate the practice of law pursuant to the constitution, no cause of action will exist between co-counsel based on the theory that co-counsel have a fiduciary duty to protect one another's prospective interests in a fee.").  In two of these cases, the plaintiff based his breach of fiduciary duty claim on an alleged joint venture agreement between co-counsel.  *Beck*, 48 P.3d at 418; *Mazon*, 144 P.3d at 1170.

The California, Washington, and Louisiana courts reached their decisions for similar reasons:  each concluded that recognizing fiduciary duties between co-counsel would create potential conflicts with the undivided loyalty lawyers owe their clients.  In *Krafchick*, the Washington Supreme Court explained:

As cocounsel, both attorneys owe an undivided duty of loyalty to the client . . . . If we were to recognize an attorney's right to recover from cocounsel prospective fees, potential conflicts of interest that harm the client's interests may arise. Cocounsel may develop an impermissible self-interest in preserving the claim for the prospective fee, even when the client's interests demand otherwise. Additionally, the question of whether an attorney's claim conflicts with the client's best interests may be difficult to answer. Discretionary, tactical decisions, such as whether to advise clients to settle or risk proceeding to trial and determining the amount and structure of settlements, could be characterized by cocounsel as a breach of the contractual duties or general duties of care owed to one another and provide a basis for claims seeking recovery of prospective fees.

*Mazon*, 144 P.3d at 1172-73.  And in *Scheffler*, the Louisiana Supreme Court stated:

[W]e conclude that it is fundamental to the attorney-client relationship that an attorney have an undivided loyalty to his or her client.  This duty should not be diluted by a fiduciary duty owed to some other person, such as co-counsel, to protect that person's interest in a prospective fee.  While, as a practical matter, both the client and co-counsel stand to benefit from any recovery, their interests are not always identical.  It would be inconsistent with an attorney's duty to exercise independent professional judgment on behalf of his client to impose upon him a fiduciary obligation to take into account the interests of co-counsel in recovering any prospective fee.

*Scheffler*, 950 So. 2d at 652-53; *see also Beck*, 48 P.3d at 422 ("To avoid any detriment to the jointly represented client, it is imperative that no collateral duties arise to interfere with the duty of 'undivided loyalty and total devotion' owed to the client.").

Like California, Washington, and Louisiana, New Jersey law recognizes that an attorney must give "complete and undivided loyalty to the client."  *State ex rel. S.G.*, 814 A.2d 612, 616 (N.J. 2003) (quotation omitted).  Indeed:

There are very few of the business relations of life involving a higher trust and confidence than that of attorney and client, or, generally speaking, one more honorably or faithfully discharged; few more anxiously guarded by the law, or governed by sterner principles of morality and justice; and it is the duty of the court to administer them in a corresponding spirit, and to be watchful and industrious, to see that confidence thus reposed shall not be used to the detriment or prejudice of the rights of the party bestowing it.

*Id.* at 617 (quotation omitted).  With these principles in mind, the Court concludes that allowing plaintiffs to assert a breach of fiduciary duty claim here would have the potential to infringe on the "complete and undivided loyalty" that attorneys in New Jersey owe their clients.  *Id.* at 616.  The possibility of a conflict is illustrated by this case.  Defendants allege that they associated with the Snyder firm because plaintiffs were not performing adequate work in support of the Prudential Litigation.  If defendants owed a fiduciary duty to plaintiffs, they would be forced to weigh their duties to co-counsel against their duties to their clients.  This position is untenable under New Jersey law, where attorneys owe complete, undivided loyalty to clients.  Following the other courts to consider this issue, the Court concludes that co-counsel do not owe fiduciary duties to each other that allow recovery for lost prospective fees.

Given this conclusion, the Court need not address defendants' other argument, that the Court should not permit plaintiffs to assert a joint venture theory for the first time at this late stage of the proceedings.  Even assuming that the parties had formed a joint venture, New Jersey law prohibits a breach of fiduciary duty claim between co-counsel to recover fees.  The Court grants summary judgment against plaintiffs' breach of fiduciary duty claim.

### 5.   Other Issues

Finally, defendants ask the Court to consider two other issues in the event it does not grant defendants' motion for summary judgment in its entirety.  First, defendants assert that the Court should limit plaintiffs' ability to recover damages in several ways.  Plaintiffs respond that these arguments are not appropriate for summary judgment.  Even if the Court properly can consider them on summary judgment, it declines to limit plaintiffs' damages here.  Defendants' short argument contains minimal legal analysis and almost no citations to case law or the summary judgment record.  Thus, defendants have not shown that there are no genuine issues of

material fact and that they are entitled to judgment as a matter of law on the damages issues they raise.

Second, defendants argue that the Court should transfer venue of this case to New Jersey. The Court twice has rejected defendants' argument to transfer this case (Docs. 40, 45), and it will not entertain the issue a third time.  The Court denies defendants' request to transfer.

### D.  Conclusion

The Court grants in part and denies in part defendants' motion for summary judgment.  It grants summary judgment for defendants on plaintiffs' breach of contract and breach of fiduciary duty claims but denies it on plaintiffs' *quantum meruit* claim.

## IV. Plaintiffs' Motion for Summary Judgment

### A.  Uncontroverted Facts

The following facts bear specifically on plaintiffs' motion for summary judgment.  They are uncontroverted or, where controverted, stated in the light most favorable to defendants, the party opposing summary judgment.  *Scott*, 550 U.S. at 378.

In 2002, when the parties first discussed the Prudential Litigation, Skepnek recommended that each client advance $10,000 for expenses in the Prudential Litigation.  The parties included the following provision in several fee agreements:

> You have agreed to advance the sum of $10,000.00 to be held in escrow for these costs.  This firm will notify you when the $10,000.00 is exhausted and you will then promptly pay an additional $10,000.00, if necessary, for costs and expenses, but, in no event, shall you be required to advance more than a total of $20,000.00 for costs and expenses.

At the outset, plaintiffs expected that there would be at least $60,000 to fund the case. While some clients advanced money to R&T, defendants assert that only three clients did so and that Roper returned one client's $10,000 because the client was experiencing financial

difficulties.  On July 18, 2006, R&T entered into a Joint Prosecution Agreement with the law

firm of Snyder, Slutkin & Snyder.  This agreement stated:

> [Snyder, Slutkin & Snyder] agreed to pay R&T [Roper & Twardowsky] the sum
> of $60,000.00 which represents a portion of the out of pocket expenses incurred
> and paid by R&T in the handling of the pending litigations. Said monies will be
> paid within thirty (30) days.  SLS agrees to be responsible for all expenses
> relating to the litigation including but not limited to investigation expenses, court
> fees, document imagin[g] coding fees, deposition fees, travel fees, appraisal fees,
> testing fees, expert fees, copying fees, trial presentation and technology fees and
> appellate counsel fees commencing May 1, 2006.  SLS will on behalf of the Firms
> and of the members of the class, pay any and all expenses associated with the
> Action.  Additional "out of pocket" expenses that come due to SLS specifically
> from these cases only shall be paid "off the top" from any recovery in these cases.
> SLS will also make payments to R&T of $225,000.00 in 2007 (providing the
> cases have not been resolved) and if the cases are still ongoing in 2008,
> $225,000.00, and such payments will be made in equal monthly installments
> beginning January 1, 2007.

Between the trust retainers from two Prudential Clients, and the $60,000 sum that the Snyder

firm paid to R&T for expenses, defendants received $80,000 in expense advancements or

reimbursements.  According to documents produced by defendants, by year-end 2006, they had

incurred $52,847.93 in client expenses in the Prudential Litigation.

Plaintiffs assert that neither defendant Roper nor any other member of R&T ever sought

financial assistance from them in the Prudential Litigation.  In response, defendants assert that

Roper asked Skepnek to contribute and he replied that he was unable to do so.  Defendants also

assert that Smoot said he could not afford plane tickets.  Roper states that her own salary

constitutes an expense she incurred in the Prudential Litigation.  She also says that she had to pay

her staff and keep her office open.  Plaintiffs' Fourth Request for Production of Documents

asked for records of checks or money taken from R&T's trust and operating accounts during the

Prudential Litigation.  Defendants produced a table showing "Total Costs & Expenses Incurred"

by R&T from January 1, 2002 to December, 31, 2006.  The table lists the following items, along

with the amount expended:  rent ($144,000.00), malpractice insurance coverage ($100,000.00),

office personnel ($975,000.00), legal library ($56,000.00), telephone services ($61,000.00),

utilities ($16,000.00), equipment ($47,000.00), attorney compensation ($2,400,000.00), medical

benefits ($165,000.00), miscellaneous expenses ($52,847.93), and finance charges ($32,500.00).

Prudential ultimately agreed to a settlement in the Prudential Litigation, and, as part of

the settlement, defendants and other participating law firms set aside approximately $140,000 (in

the first phase of the settlement) and $698,165 (in the second phase of the settlement) to

reimburse all of the lawyers' expenses.

Plaintiffs do not seek any fees directly from the clients but instead seek to share in the

attorney's fees from the settlement of the Prudential Litigation.  Plaintiffs have made no

demands on the clients in the Prudential Litigation nor have they attempted to bring any of the

clients in the underlying matter into the lawsuit as parties.  Plaintiffs also have made no effort to

communicate with any of the Prudential Clients throughout this litigation, and plaintiffs have not

deposed any of them.

### B. Analysis

Plaintiffs seek summary judgment on both of defendants' two counterclaims.  These

counterclaims assert that:

(1) Plaintiffs breached their agreement to assume joint responsibility for
representing the six clients whom they had retainer agreements, abandoned
the clients, and failed to provide the funding, resources, or work promised.

(2) Plaintiffs intentionally interfered with the contractual rights of defendants'
clients in the Prudential matter by improperly seeking attorneys' fees from
defendants' clients with whom they had no attorney-client relationship with
and have diverted defendants' resources in representing those clients in the
ongoing Prudential [L]itigation by filing the present frivolous action.

Doc. 256 at 15.  The Court addresses each counterclaim in turn below.

43

### 1. Breach of Contract

Defendants assert a breach of contract claim against plaintiffs.  Specifically, defendants accuse plaintiffs of breaching an agreement to share responsibility for the Prudential Litigation by "abandon[ing]" the original six Prudential clients and failing to provide funding, resources, or work in support of the lawsuit.  *Id.*  Plaintiffs filed a motion and a memorandum seeking summary judgment on both of defendants' counterclaims.  Defendants filed a response, but, notably, it defends only their second counterclaim, for tortious interference (discussed below).  The response never mentions their breach of contract claim, except in response to plaintiffs' statement of facts.  Nevertheless, the Court cannot grant summary judgment by default.  *See* Fed. R. Civ. P. 56(e).  Plaintiffs must still show that there is no genuine issue of material fact and they are entitled to judgment as a matter of law.

As discussed above, to recover on a breach of contract claim under New Jersey law, a party must prove:  "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party asserting the claim performed its own contractual obligations."  *Frederico*, 507 F.3d at 203.  The Court already has concluded that there is a genuine issue of material fact about whether the parties formed a contract to split fees and whether plaintiffs breached that contract.  But the Court grants summary judgment on the contract hypothesized by this counterclaim because defendants have failed to show that there is a genuine issue of material fact that they suffered damages.

Defendants received expense advances from at least two Prudential Clients and entered into an agreement with the Snyder firm to share expenses.  And defendants concede that the settlement in the Prudential Litigation set aside money to reimburse all the participating law firms for expenses incurred.  The attorneys in the Prudential Litigation, including R&T, shared

$140,000 in the first phase of the settlement and $698,165 in the second phase of the settlement. As plaintiffs point out, defendants do not identify or even assert that this recovery did not compensate them fully for any expenses they incurred in the Prudential Litigation.  To satisfy their summary judgment burden, plaintiffs "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'"  *Kannady*, 590 F.3d at 1169 (quoting *Sigmon*, 234 F.3d at 1125).  Defendants have failed to rebut plaintiffs' evidence showing that they suffered no damages as a result of any breach of contract by plaintiffs.  The Court therefore grants summary judgment for plaintiffs on defendants' first counterclaim.

### 2.  Tortious Interference with Contract

The Court also grants summary judgment for plaintiffs on defendants' second counterclaim.  Defendants assert a counterclaim for tortious interference with contract. Specifically, they argue that plaintiffs "intentionally interfered with the contractual rights of defendants' clients in the Prudential matter by improperly seeking attorneys' fees from defendants' clients with whom they had no attorney-client relationship with and have diverted defendants' resources in representing those clients in the ongoing Prudential litigation by filing the present frivolous action."  Doc. 256 at 15.

In New Jersey, the elements of a claim for tortious interference with an existing contract are:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Nostrame v. Santiago*, 61 A.3d 893, 901 (N.J. 2013) (quoting Restatement (Second) of Torts § 766).  One element of this formulation is crucial here.  Defendants can recover for tortious

interference only if the intentional interference "caus[ed] the third person not to perform the contract . . . ." *Id.*  It is undisputed that R&T had a contract with each Prudential Client relevant to this case.  Under these contracts, the Prudential Clients agreed to pay defendants attorney's fees in exchange for legal services.  But defendants have adduced no evidence that the Prudential Clients did not perform their contracts with defendant by refusing to pay the attorney's fees they owed defendants.  Thus, defendants cannot prove one of the elements of tortious interference, and the Court grants summary judgment for plaintiffs on defendants' second counterclaim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' Motion to Strike (Doc. 271) is granted; defendants' Motion for Summary Judgment (Doc. 267) is granted in part and denied in part; and plaintiffs' Motion for Summary Judgment (Doc. 270) is granted.

**IT IS SO ORDERED.**

**Dated this 23rd day of July, 2015, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**